# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: November 10, 2021

```
* * * * * * * * * * * * * *    *
TAMMY SCHETTL,                  *        PUBLISHED
                               *
          Petitioner,          *        No. 14-422V
                               *
v.                             *        Special Master Dorsey
                               *
SECRETARY OF HEALTH            *        Ruling on Damages; Health Insurance
AND HUMAN SERVICES,            *        Premiums; Medigap; Influenza ("Flu")
                               *        Vaccine; Complex Regional Pain Syndrome
          Respondent.          *        ("CRPS").
                               *
* * * * * * * * * * * * * *    *
```

Richard Gage, Richard Gage, P.C., Cheyenne, WY, for petitioner.
Colleen Hartley, U.S. Department of Justice, Washington, DC, for respondent.

### RULING ON REMAINING ITEMS OF DAMAGES[1]

## I.    INTRODUCTION

On May 15, 2014, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 et seq. ("Vaccine Act" or "the Program"),[2] alleging that she suffered from Complex Regional Pain Syndrome ("CRPS") caused by her October 4, 2011 influenza ("flu") vaccination. Amended ("Am.") Petition at 1-2 (ECF No. 29). Respondent conceded that petitioner is entitled to compensation, and a Ruling on Entitlement issued on August 7, 2018. Ruling on Entitlement dated Aug. 7, 2018 (ECF No. 116).

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012). All citations in this Ruling to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

Because the parties had been unsuccessful in resolving pain and suffering damages, a damages hearing was held on August 9 and 10, 2018. A ruling on pain and suffering issued on January 22, 2019. There, the undersigned awarded petitioner $200,000.00 for actual pain and suffering and "$10,000.00 per year reduced to net present value, for the rest of her life expectancy, for future pain and suffering." Ruling Awarding Pain and Suffering Damages dated Jan. 22, 2019, at 14 (ECF No. 145). Shortly thereafter, the undersigned issued a ruling regarding the set-off of petitioner's settlement with the vaccine administrator on March 6, 2019. Ruling on Set-off dated Mar. 6, 2019 (ECF No. 149).

Although the parties continued to work together to resolve the remaining items of damages, they continued to disagree on a number of matters, and thus, the undersigned issued a decision awarding interim damages. Decision Awarding Interim Damages dated Mar. 25, 2020 (ECF No. 207). She found an award for petitioner's actual pain and suffering and past unreimbursable medical expenses, offset by the amount found in the Ruling on Set-off, appropriate in this case. Id. at 2.

Since the undersigned's decision awarding interim damages, the parties have agreed on compensation for petitioner's loss of earnings and the remainder of petitioner's pain and suffering award. Petitioner's ("Pet.") Status Report ("Rept."), filed July 29, 2021 (ECF No. 268). In a status conference held on September 28, 2021, the undersigned found the petitioner was entitled to the following items for the remainder of petitioner's life expectancy: (1) independent case management every other year; (2) housekeeping services twice per month; and (3) yard care, snow removal, and handyman services. Order dated Sept. 30, 2021, at 2-3 (ECF No. 280).

Pursuant to the most updated consolidated Life Care Plan, the parties have agreed to most items of damages. See Respondent's Exhibit ("Resp. Ex.") N. Respondent has agreed to pay health insurance premiums from 2022 to 2024, so petitioner can attend a comprehensive three-week pain management program at the Mayo Clinic to help her develop skills strategies to address and manage her ongoing pain from CRPS. Id. at 8.

On November 8, 2021, the undersigned held a status conference to discuss the two items of damages that remain in dispute: (1) whether petitioner is entitled to the costs of health insurance premiums from 2025 through 2031 (when she becomes eligible for Medicare) and (2) whether petitioner is entitled to Medigap. The parties requested that the undersigned adjudicate these issues that remain in dispute. With the parties' consent, the undersigned provided an oral ruling on her findings, set forth in this Ruling. The undersigned finds that petitioner is entitled to the cost of health insurance premiums from 2025 to 2031, discounted by the amount that she would have paid toward the premiums if she were still employed. The undersigned also finds that petitioner is not entitled to payment reflecting the cost of Medigap.

## II.    BACKGROUND[3]

The framework for the undersigned's ruling rests on three foundational bases: (1) The Vaccine Act's language with respect to compensation; (2) the nature of petitioner's vaccine injury, CRPS; and (3) the fact petitioner is now disabled, but prior to her disability she had health insurance coverage through her employer, Olmstead County.

The Vaccine Act provides that,

Compensation awarded under the Program to a petitioner . . . for a vaccine-related injury . . . shall include the following:
>    (1)(A) Actual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses which–
>>       (i) result from the vaccine-related injury for which the petitioner seeks compensation,
>>       (ii) have been or will be incurred by or on behalf of the person who suffered such injury, and
>>       (iii)(I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary . . . .

§ 15(a)(1)(A).

The evidence in this case has established that CRPS is a "debilitating pain syndrome[]" usually associated with a history of trauma.  Pet. Ex. 12 at 1.  It can be seen after even minor trauma, like an intramuscular injection.  Id.  The syndrome may cause "significant morbidity and loss of quality of life."  Pet. Ex. 16 at 1.  "There is no correlation between the severity of the initial injury and the ensuing painful syndrome."  Pet. Ex. 12 at 1.

In CRPS, pain may vary "in quality from a deep ache to a sharp stinging or burning sensation."  Pet. Ex. 12 at 2.  Pain may be exacerbated by cold, anxiety, and stress.  Id.  Hypersensitivity may be present and increased with pain on exposure to cold.  Id.  A person with the condition by also have "an increased response to painful stimuli."  Id.

Most CRPS patients experience a progression of the area affected.  Pet. Ex. 14 at 6.  The literature suggests that there are three patterns of progression, or spread: contiguous, independent, and mirror-image.  Pet. Ex. 12 at 2-3.  In his expert report, Dr. Kinsbourne opined that petitioner had contiguous spread into her right arm and mirror-image spread in her left arm.  Pet. Ex. 8 at 5.  Dr. Kinsbourne's opinions in this regard are consistent with petitioner's medical records and her testimony as to the spread of her pain.

Those with CRPS may experience "associated symptoms of psychologic distress" including "[a]nxiety, depression, fear, [and] anger."  Pet. Ex. 12 at 3.  Prognosis is variable, but

---

[3] Most of this section is taken from the undersigned's Ruling Awarding Pain and Suffering Damages.  See Ruling Awarding Pain and Suffering Damages at 9-10, 13.

in general is believed to be "poor when symptoms become chronic." Id. at 6. In the Schwartzman study of 656 patients who had CRPS for at least one year, none of the patients experienced spontaneous recovery or remission. Pet. Ex. 14 at 1, 6. Moreover, Dr. Kinsbourne stated that petitioner had tried many different treatments without success, and "[t]hus far her severe neuropathic pain has proved to be intractable. Based on evidence that is currently available, her outlook is bleak and one cannot foresee any end to her pain disorder." Pet. Ex. 42 at 2.

With regard to severity, there is no question that petitioner has suffered a significant and painful injury. There are repeated references in her medical records from a number of different providers where she consistently compared her pain to being punched in the arm. At times, she described the pain as hot and burning, or searing. The pain has limited her ability to perform all activities of daily living, physical activity, socializing, hobbies, and leisure activities. Although there are references in the medical records from 2012 stating that petitioner was participating in some recreational activities, records from 2013 and later demonstrate that she is no longer able to engage in those leisure activities. Dr. Hoelzer, a pain specialist, diagnosed petitioner with "severe intractable neuropathic pain." Pet. Ex. 3 at 38.

Since her injury in 2011, petitioner has self-reported her pain at ranges from 2/10 to 7/10. She is hypersensitive to touch and vibration, and "exquisitely sensitive to cold temperatures." She has reported severe sleep disturbances. She has seen numerous doctors and undergone every recommended treatment, except for the Mayo Clinic Program mentioned above. So far, none of the treatments or therapies were successful.

In 2013, Dr. Bengtson opined that her pain was likely to continue, and unfortunately that has been the case.

Further, the evidence establishes that petitioner was a long-time employee of Olmstead County and that she was disabled due to her vaccine-related injury. In a letter dated November 13, 2019, petitioner's physician, Dr. Keith Bengtson, recommended petitioner stop working. Pet. Ex. 74. He opined that she was disabled. Id.

On March 11, 2021, the undersigned held a status conference. Ruling on Petitioner's Date of Disability and Scheduling Order dated Mar. 11, 2021 (ECF No. 247). With the parties' permission, and after a review of the recently submitted evidence, specifically Exhibit 94, a letter from Dr. Florek, the undersigned issued a ruling as to petitioner's date of disability. Id. at 1. The undersigned found that the date of petitioner's disability was August 16, 2020. Id. (citing Pet. Exs. 90-91, 94). The parties agreed that the evidence supported this date of disability, and the life care plans were updated accordingly. Id.

## III.    DISCUSSION

In reaching her decision, the undersigned has previously reviewed all of the evidence that has been filed by the parties, and specifically the most recent Life Care Plan, life care plan cost projections analysis, the parties' joint status report, petitioner's memorandum on insurance, and the case law cited by the parties. See Resp. Ex. N; Pet. Exs. 100-01; Joint Status Rept., filed Oct.

28, 2021 (ECF No. 284); Pet. Memorandum on Insurance ("Pet. Memo."), filed Oct. 28, 2021 (ECF No. 283); see also, e.g., Schwenk v. Sec'y of Health & Hum. Servs., 956 F.2d 1173 (Fed. Cir. 1992). These filings provide the following evidence.

Petitioner's life care planner, Elizabeth Kattman, stated, "Given [petitioner's] age, 54, and her diagnoses of progressive CRPS . . . , as well as other multiple health conditions, she needs health insurance coverage." Pet. Ex. 100 at 1. She also stated petitioner "had good health insurance coverage through her employer, Olmsted County, with a lower deductible and out-of-pocket maximum than she could presently purchase. Because of her vaccine injury, which results in debilitating pain and is progressive, [petitioner] is no longer employed and is no longer able to work." Id.

Ms. Kattman found "[t]he Blue Cross/Blue Shield of Minnesota plan referenced in the July 2021 life care plan offers better coverage for [petitioner] than the Medica Bronze EPO plan, and it is offered by an existing well known insurance company." Pet. Ex. 100 at 1. However, [n]either plan provides [petitioner] the level of coverage she had when she was employed by Olmsted County." Id. Ms. Kattman opined "[i]t is not reasonable for [petitioner] to be uninsured from 2025 to 2031. She will need to purchase health insurance privately which will be more expensive and provide less coverage than what she would have had if she were able to remain employed." Id.

Dr. Mark McNulty, petitioner's economist, also provided a letter and a copy of one of petitioner's pay stubs. Pet. Ex. 101. The pay stub verifies that petitioner's employer, Olmstead County, paid $9,424.00 per year, while petitioner paid $1,053.00 per year, for a total of $10,478.00 per year for health insurance premiums. Id. at 2-3.

Specifically, the first question at issue is whether the undersigned should award the cost of health insurance premiums until petitioner qualifies for Medicare at the age of 65 (from 2025 through 2031), or whether the undersigned should award the actual projected cost of medical expenses, which are much lower than the cost of insurance.

The facts of this case are unique. Petitioner sustained a vaccine-related injury that resulted in a progressive pain and other sequalae, and disability. She is unable to work, and she therefore lost her health insurance that her employer paid for in large part. Because the petitioner had insurance through her employer, and because she lost these projected unreimburable expenses due to her vaccine-related injury, the undersigned finds the cost of health insurance premiums to be reasonably necessary and a reasonable expense to which petitioner is entitled. However, prior to her injury, petitioner paid approximately one-tenth of the cost of her health insurance premiums. Therefore, the health insurance premiums will be discounted by the amount petitioner paid toward her premiums.[4] This award contemplates that

---

[4] The parties confirmed that the lost wages amount agreed upon by the parties does not reflect a reduction for fringe benefit payments, specifically for the amount that petitioner paid toward her health insurance premiums. The parties have agreed on petitioner's lost wage claim. This Ruling contemplates that petitioner will pay her approximate one-tenth of the cost of her health insurance premium from her lost wage award.

petitioner will be awarded the cost of the Blue Cross/Blue Shield of Minnesota plan, which was agreed upon by the life care planners as the most appropriate plan for petitioner given her particular medical needs. This Ruling only pertains to the period between 2025 and 2031, as the parties have agreed to cost of health insurance premium between 2022 and 2024. See Resp. Ex. N at 2-3. Thus, the parties' previous agreement as to health insurance for 2022 to 2024 is not affected.

Next, with regard to Medigap, the undersigned finds petitioner is not entitled to Medigap. Medigap is something her employer did not and would not have paid for had petitioner remained employed. Thus, it is not an unreimbursed expense. Further, it is not cost effective given that respondent has agreed to pay for petitioner's out-of-pocket expenses (copays) for those appointments that are medically reasonable and necessary, as reflected in the life care plan.

## IV.     NEXT STEPS

In a status report filed on November 9, 2021, petitioner confirmed she "has not received treatment through Medicaid for her vaccine related injury and, therefore, there is no lien with Minnesota Medicaid for Petitioner." Pet. Status Rept., filed Nov. 9, 2021 (ECF No. 285).

After discussion, the parties agreed to work together to effectuate this Ruling into a consolidated Life Care Plan, and respondent agreed to file a Proffer **in 30 days, or by Friday, December 10, 2021**. In the event that the parties need additional time, they may seek an extension of time.

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Special Master